**Michael PETERSON, Relator,**

v.

**FRED VOGT & COMPANY, Commissioner of Jobs and Training, Respondents.**

No. C8–92–2021.

Court of Appeals of Minnesota.

Feb. 23, 1993.

Michael Peterson, pro se.

Charles O. Green, Dept. of Jobs & Training, St. Paul, for Commissioner of Jobs and Training.

Considered and decided by PARKER, P.J., and FORSBERG and KALITOWSKI, JJ.

## OPINION

PARKER, Judge.

Michael Peterson appeals by writ of certiorari from a decision issued by a representative of the Commissioner of Jobs and Training. The Commissioner's representative found that Peterson, a technician-driver for respondent Fred Vogt & Company, had received several off-duty speeding tickets and, as a result, had temporarily lost his driver's license. The Commissioner's representative concluded that Peterson had committed misconduct disqualifying him from receiving unemployment compensation. We reverse.

## FACTS

Relator Michael Peterson was employed by Fred Vogt & Company ("Vogt") between 1979 and 1991 as a full-time heating and air conditioning technician. Peterson's job required that he maintain a driver's license in order to make service calls. He drove a company vehicle during working hours.

Peterson received five speeding tickets between July 8, 1989, and March 23, 1990. All of the tickets were received after working hours and while he was driving his own car.

On July 3, 1990, Vogt issued Peterson a formal notice stating that, as a result of Peterson's driving record, Vogt's insurance could be canceled at any time. The notice also stated:

It is possible that Vogt will have to contain your service vehicle. At that time, we would still use your talents, but in your own vehicle (with proof of insurance).

\* \* \* \* \* \*

It is also possible that the insurance company and Vogt may agree on termination to prevent further raises in policy.

Peterson received two more off-duty speeding tickets, in October 1990 and August 1991. In September 1991 he was informed by the Department of Public Safety (DPS) that his driver's license would be suspended for 90 days. The undisputed evidence indicates, however, that he could have continued driving for Vogt had he received a limited work license from the DPS. Peterson asked Vogt's president to sign a statement that he needed the limited license for his work. Vogt's president refused to sign the statement and instead discharged him. At the time of the discharge, the DPS had not yet suspended Peterson's license.

Prior to his discharge, Peterson asked Vogt's service manager if he could continue working if he drove his own car with proof of insurance. He was not allowed to continue working for Vogt under those conditions.

Upon his discharge, Peterson applied to the Department of Jobs and Training for unemployment compensation. A lengthy appeal process ensued, involving three hearings before three different referees. Two referees concluded that Peterson had not committed misconduct disqualifying him from receiving unemployment compensation. Ultimately, however, a Commissioner's representative issued a decision concluding that he had committed disqualifying misconduct.

## ISSUE

Did Peterson commit misconduct by receiving seven off-duty speeding tickets, resulting in the temporary suspension of his regular driver's license, although he may have been able to continue driving for Vogt under a limited license?

## DISCUSSION

■ An individual who is discharged from employment due to misconduct is disqualified from receiving unemployment compensation. Minn.Stat. § 268.09, subd. 1(b) (1990). The unemployment statutes are remedial in nature, and the employer therefore has the burden of proving that the employee committed disqualifying misconduct. *See Ress v. Abbott Northwestern Hosp., Inc.,* 448 N.W.2d 519, 523 (Minn. 1989).

■ An employee's misconduct must interfere with and adversely affect employment. Minn.Stat. § 268.09, subd. 1(b). "Misconduct" has been defined as

conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' \* \* \*.

*Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973) (citing *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636, 640 (1941)). The issue is not whether an employer was justified in dismissing an employee, but wheth-

er the employee committed disqualifying misconduct for unemployment compensation purposes. *See Ress*, 448 N.W.2d at 523. Whether an individual has committed misconduct is ultimately a question of law, to be independently reviewed on appeal. *See Markel v. City of Circle Pines*, 479 N.W.2d 382, 384 (Minn.1992).

In *Swanson v. Columbia Transit Corp.*, 311 Minn. 538, 248 N.W.2d 732 (1976), a school bus driver was involved in three on-duty accidents within 47 days. In two of the accidents, the driver rear-ended other cars. Grievance committees found that the driver was at fault in one accident and drove carelessly and excessively fast in the other. Nevertheless, the supreme court reversed the denial of unemployment compensation, concluding that the driver's behavior did not constitute disqualifying misconduct. Rather, the court characterized the accidents as "incidents of inadvertence or negligence." *Id.* 248 N.W.2d at 733.

■ In this matter, Peterson's speeding violations had less of an impact on his employer than the accidents in *Swanson*. Peterson's speeding incidents occurred in his own vehicle, while he was off duty, and did not involve damage to other vehicles.

In *Eddins v. Chippewa Springs Corp.*, 388 N.W.2d 434 (Minn.App.1986), an employee driver received six traffic tickets over approximately two and one-half years of employment. The employee received one of the tickets during working hours, for making an illegal turn. The other tickets, for speeding and illegal lane change, were received while the employee was off duty and driving his own vehicle. The employee did not lose his license, but he was discharged because the employer's insurer refused to cover him.

In *Eddins*, this court, relying on *Swanson*, reversed the Commissioner's determination that the employee had committed misconduct, reasoning:

> Courts in at least three other jurisdictions have refused to find misconduct where an employer's insurance status has been adversely affected by an employee's driving record. * * * Additionally, the basis on which Chippewa

Springs made its determination to discharge Eddins, its insurer's action, does not bear on the willfulness or lack of willfulness in Eddins' actions.

> While Eddins' acts support strong inferences of inadvertence or negligence, we do not find a sufficient basis to support a finding of disqualifying misconduct.

*Id.* at 435–36.

As in the present case, the employee in *Eddins* had received numerous traffic tickets. Under the reasoning of *Eddins*, Peterson's status with Vogt's insurer is irrelevant when determining whether Peterson committed disqualifying misconduct.

In this case, the Commissioner's representative did not discuss *Swanson* or *Eddins*, but relied solely on *Markel v. City of Circle Pines*. *Markel* involved a city utilities worker whose duties required him to maintain a valid driver's license so that he could drive Class B and Class C vehicles. One evening after work, while the employee was driving home in his own vehicle, he fell asleep and drove his vehicle into a telephone pole. The employee pleaded guilty to driving while under the influence of alcohol, and his driver's license was revoked for one year.

The city suspended the employee because he could no longer perform his job duties. The employee thereupon applied to the DPS for a limited license for work purposes. The employee obtained a letter from his supervisor stating that he needed the license for his work, and the DPS issued the employee a Class B limited license. That license, however, did not allow the employee to drive Class C vehicles. The employee was not able to obtain a Class C license, and eventually the city dismissed him.

On appeal, the supreme court affirmed the Commissioner's conclusion that the employee had committed disqualifying misconduct. The court distinguished *Swanson* and focused on the loss of the license and the criminal offense of drinking and driving. *Markel*, 479 N.W.2d at 385.

In the present case, the Commissioner's representative ignored the law established in *Swanson* and *Eddins* and relied instead on *Markel* to deny Peterson's claim for unemployment compensation. We are troubled by the Commissioner's representative's analysis because we believe *Markel* is easily distinguishable in several respects. First, the employee in *Markel* was convicted of drinking and driving, an offense substantially more serious than speeding. Second, the employer in *Markel* signed the statement necessary for the employee to obtain a limited driver's license, whereas Vogt refused to sign the statement that would have allowed Peterson to continue working. With the statement, Peterson probably could have obtained a limited license; in *Markel* the employee was unable to obtain the necessary license, despite his employer's cooperation. Finally, the employer in *Markel* attempted to accommodate the employee's needs and did not dismiss him until after his regular license was actually revoked and he could not obtain a necessary work license. By contrast, Vogt did not make even a minimal attempt to accommodate Peterson and, although the company had first suggested that he might continue if he used his own car, and he specifically asked to do so, Vogt discharged him even before his regular license had been suspended.

## DECISION

Peterson's temporary loss of his driver's license, as a result of several off-duty speeding violations, did not constitute misconduct disqualifying him from receiving unemployment compensation where his employer refused to sign a statement necessary for Peterson to obtain a limited work license.

Reversed.