John F. NIESZNER, Relator,

v.

**MINNESOTA DEPARTMENT OF JOBS & TRAINING, Commissioner of Jobs & Training, Respondents.**

No. C5–92–2204.

Court of Appeals of Minnesota.

May 11, 1993.

Randall D.B. Tigue, Minneapolis, for relator.

Kent E. Todd, Dept. of Jobs and Training, St. Paul, for respondents.

Considered and decided by PETERSON, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

HUSPENI, Judge.

By writ of certiorari, relator John F. Nieszner contends that (1) employer Minnesota Department of Jobs and Training failed to make a timely appeal from the initial claims adjudicator's determination that relator was not disqualified from receiving unemployment benefits; (2) further review by a different adjudicator violated provisions of Minn.Stat. ch. 268 and his right to due process; and (3) the Commissioner's representative erroneously decided employer discharged relator for misconduct. We reverse.

## FACTS

Relator, a 24–year employee of the Minnesota Department of Jobs and Training (employer), was a senior employment counselor at employer's south Minneapolis office. Employer suspended and later discharged relator in October 1991.

Prior to discharge, employer imposed a ten-day suspension on relator in March 1990 for unprofessional and harassing behavior toward employees of another social service agency, and a 30–day suspension in May 1990 for sexually harassing a female client he had counseled. Employer gave relator a written reprimand in March 1991 for failing to provide services to a client.

Commencing in August 1991, a series of interactions took place between relator and

a Capitol Security guard staffed at relator's place of work. On one occasion the guard went to relator's office and interrupted relator to deliver a message to a client that a ride was waiting. The guard and relator disagreed about whether the guard's behavior was appropriate. However, instead of bringing the incident to the office manager, Bonnie Grussing, relator wrote a complaint letter about the guard to Ralph Church, Commissioner of Public Safety.

Two days later, relator saw the guard, who did not have clearance to log-on the computer, looking at a screen at the receptionist's desk to obtain information about a client who had threatened a claims adjudicator. Relator told the receptionist she had violated the Data Practices Act. Grussing later advised relator that the guard's actions were appropriate when a client threatens an adjudicator.

After Grussing became aware of the letter to Church, she informed relator he had violated the "chain of command" and directed him that in the future he was to bring concerns directly to her. He agreed to do so. Grussing also told relator the guard had not violated the Data Practices Act.

In September 1991, relator complained in writing to Grussing and a Capitol Security advisor that the guard sexually harassed a woman employee, did not enforce the no smoking rule in the facility, and allowed a client to fill out an application in a secured area where employer kept client files and confidential testing materials. Grussing took the allegation of sexual harassment seriously, and relator's supervisor, Conrad Derus, interviewed all women employees, each of whom denied the guard had harassed them.

Later in September 1991, relator wrote to the Governor claiming employer's management was obstructing justice and retaliating against him for complaining. He wrote again to Church, reasserting his position that the guard had sexually harassed a female employee. Both letters were forwarded to Grussing.

On September 20, 1991, relator took photographs of the guard, who felt harassed by this action. At a meeting with his union representative and employer a short time later to discuss relator's continued violations of the chain of command, relator stated he had a camera on the premises for a retirement party and to document his safety and hygiene concerns at the office. He denied taking pictures of the guard. Grussing testified that when relator was asked to disclose the name of the woman the guard had allegedly harassed, he refused.

Prior to October 4, 1991, relator repeatedly telephoned Ron Treet, employer's Director of Employee and Consumer Affairs, to report alleged violations of law. Upon being notified of these calls, Grussing ordered relator to cease and desist the calling, which he did. However, relator wrote to Treet alleging "fraud, waste, abuse (ethics violations) etc.," and to the Commissioner of Jobs and Training, complaining, among other things, that Grussing favored some employees and that she allowed the sale of Avon, Tupperware, Christmas wreaths, and Happenings books for the benefit of a local church.

On Friday, October 11, 1991, Grussing and Derus met with employer's Director of Labor Relations in St. Paul, and decided that relator's failure to follow the chain of command required a suspension pending an investigation into the relevant issues raised by and about him. The investigatory suspension was to be effective October 14, 1991.

At approximately 3:55 p.m. on October 11, 1991, Grussing telephoned relator to arrange a meeting. Relator informed Grussing that he would not remain past 4:30 p.m.; Grussing replied that relator would be paid overtime if he remained past that time. When Grussing and Derus arrived at the office at 4:20 p.m., Grussing went to her office. Derus advised relator that Grussing wanted to see him immediately to "interview [him] right now." When relator said he needed to sign off the computer, Derus told him he would take care of it. When relator ignored Derus

and continued working, Derus informed Grussing that relator did not appear willing to meet with her. At about 4:29, Grussing and Derus went to relator's work area. Relator ignored them both and left. Grussing followed relator out of the building and called his name. Relator yelled "leave me alone" and "don't touch me" as he ran across the street.

Relator testified that, sensing impending discipline, he attempted unsuccessfully to reach his union representative after receiving Grussing's telephone call. He claims that under the terms of the collective bargaining agreement, he was not required to meet with Grussing without a representative present. Relator, however, neither attempted to inform employer that he had tried to contact a union representative nor offered to meet with Grussing the following Monday.

Employer discharged relator, according to Grussing, based solely upon the last incident of insubordination on October 11, 1991. Upon relator's claim for unemployment benefits, the chief adjudicator, John Van Steenwyk, issued a determination November 29, 1991, that relator was discharged for reasons other than misconduct and was qualified to receive benefits. The determination contained notice of the right to appeal within 15 days. *See* Minn.Stat. § 268.10, subd. 2(3) (1990).

Employer did not appeal the initial determination. Rather, within the appeal period, employer sought and received a second determination from a different adjudicator, T.L. Clark, employer's Director of Benefits. Based upon "receipt of a signed statement from [relator's] manager that was not previously provided by the [employer]," Clark determined on December 7, 1991, that relator was insubordinate, failed to follow the chain of command, refused to meet with his manager on October 11, 1991, and was discharged for misconduct.

Relator appealed Clark's determination on December 14, 1991. A referee concluded employer had discharged relator for misconduct. On appeal from the referee's decision, the Commissioner's representative affirmed.

## ISSUE

Does the Minnesota Jobs and Training Law allow an employer aggrieved by an adverse initial determination of qualification to obtain a redetermination in lieu of appealing, and did employer's failure to make a timely and formal appeal from the initial determination that relator was not disqualified from receiving benefits preclude further review by the Department of Jobs and Training?

## ANALYSIS

The Minnesota Department of Jobs and Training is both employer and adjudicator in this matter. This court recently answered the concerns about apparent bias, prejudice and partiality by stating that the "rule of necessity" allows the Commissioner of Jobs and Training to adjudicate because she is the only official authorized by statute to determine entitlement to unemployment benefits. *Ginsberg v. Minnesota Dep't of Jobs & Training*, 481 N.W.2d 138, 141 (Minn.App.1992), *pet. for rev. denied* (Minn. Apr. 9, 1992). However, when the employer is also the adjudicator, the reviewing court "probably should review with special intensity." 3 Kenneth C. Davis, *Administrative Law Treatise* § 19:9 (2d ed. 1980), *quoted in Ginsberg*, 481 N.W.2d at 141.

■ Relator argues that employer failed to make a proper and timely appeal from the initial determination by Van Steenwyk, and the failure to appeal made the initial determination final precluding further review of his claim by the Department of Jobs and Training. We agree.

■ An initial determination becomes final unless an appeal is taken. Minn.Stat. § 268.10, subd. 2(3) (1990) provides:

A determination * * * shall be *final* unless an *appeal therefrom is filed by a claimant or employer within 15 days* after mailing of the notice. * * * Every notice of determination shall contain a prominent statement indicating in clear language the method of appealing the determination, the time within which

such an appeal must be made, and the consequences of not appealing the determination.

(Emphasis added.) Minn.Stat. § 268.10, subd. 2(3) does not provide for extensions or exceptions to the 15–day appeal period. *Cole v. Holiday Inns, Inc.*, 347 N.W.2d 72, 73 (Minn.App.1984). The time limit set for appeal is "absolute." *Baldinger Baking Co. v. Stepan*, 354 N.W.2d 569, 571 (Minn. App.1984), *pet. for rev. denied* (Minn. Dec. 20, 1984). A department referee must dismiss an untimely appeal for lack of jurisdiction. *Cole*, 347 N.W.2d at 73.

■ Employer did not appeal from the initial determination in favor of relator. Instead, employer sought a redetermination of that decision and obtained a decision favorable to itself. We agree with relator that the Minnesota Jobs and Training statutes and regulations do not allow an employer to "adjudicator-shop" and seek a second determination on the issue of disqualification rather than appealing the adverse determination.

■ The Commissioner, after the initial filing of a claim and establishment of a benefit year, must give notice to the last employer. Minn.Stat. § 268.10, subd. 2(1) (1990). If the employer, within seven days, makes an allegation of disqualification, the official must promptly make a determination of qualification, as well as validity and eligibility, and notify the parties. *Id.;* Minn.R. 3310.2700, subpt. 2, 3310.2800, subpt. 2 (1991).[1] The determination then becomes final unless appealed. Minn.Stat.

§ 268.10, subd. 2(3). Thus, section 268.10, subd. 2(1) provides the mechanism by which an employer raises an issue of disqualification when a claim is initially filed.

■ Employer's reliance upon Minn. Stat. § 268.10, subd. 2(2) (1990) in arguing that it may obtain a second determination in lieu of appealing the initial determination is misplaced. Minn.Stat. § 268.10, subd. 2(2) states:

At any time within 24 months from the date of the filing of a valid claim for benefits by an individual * * * *any official of the department or any interested party or parties or benefit year employer raises an issue of disqualification in accordance with the rules of the commissioner*, a determination shall be made thereon and a written notice thereof shall be given to the claimant and such other interested party or parties or benefit year employer. A determination issued under this clause which denies benefits for weeks for which the claimant has previously been paid benefits is an overpayment.

(Emphasis added.) This statute, read literally, conflicts with the seven-day period during which an employer may initially allege disqualification. Furthermore, the rules of the Commissioner are silent on enumerating how and under what circumstances the department, an interested party, or a benefit year employer may raise an issue of disqualification within 24 months. *See* Minn.R. chs. 3305, 3310 (1991).[2]

---

1. An employer may raise disqualification when it returns the request for wage and separation information. Minn.R. 3310.2700, subpt. 2(F) (1991). Upon receipt of the information:

   the department shall make an *initial determination* as to the validity of such claim and deliver or mail a notice thereof to the claimant and other interested parties. *The claimant or any other interested party may appeal such initial determination to an appeal tribunal designated by the commissioner to hear and determine such matters.*

   Minn.R. 3310.2700, subpt. 5 (1991) (emphasis added). When an employer challenges qualification, the department must make a determination on the issue of disqualification in writing and provide notice to the claimant and the employer. Minn.R. 3310.2800, subpt. 2 (1991). "The claimant or other interested party may

appeal said initial determination to an appeal tribunal." *Id.*

2. The legislature amended the unemployment law in 1951 to include the provision that allows the issue of disqualification to be raised under the rules of the Commissioner. 1951 Minn. Laws ch. 442, § 4. The statute reads:

   If within the benefit year * * * any official of the department or any interested party or parties or benefit year employer raises an issue of disqualification in accordance with the regulations of the commissioner, a determination shall be made thereon and a written notice thereof shall be given.

   Minn.Stat. § 268.10, subd. 2(4) (1953). Research of Minnesota and Jobs and Training regulations from the 1950s forward reveals that no rules have been promulgated to make specific

Interpreting Minn.Stat. § 268.10, subd. 2(2) to allow an employer within 24 months, in essence, to "reopen" or to "revisit" the issue of disqualification where that issue was determined initially and not appealed leads to an absurd or unreasonable result. Minn.Stat. § 645.17(1) (1990).

When an employee has been found entitled to receive unemployment benefits, an employer must appeal that determination under Minn.Stat. § 268.10, subd. 2(3) and may thereby attempt to prove the discharge was for misconduct. *See Ress v. Abbott Northwestern Hosp., Inc.*, 448 N.W.2d 519, 523 (Minn.1989) (employer has burden to show by the greater weight of evidence that it discharged employee for misconduct). Minn.Stat. § 268.10, subd. 2(2) does not provide an employer who received an adverse initial determination a second opportunity to determine the issue of disqualification for unemployment benefits. Subdivision 2(2) addresses "determination," not "redetermination" of the issue of disqualification.[3] We conclude the legislature could not have intended that subdivision 2(2) allows the department or an employer to engage in the conduct resorted to in this case.

■ Employer contends the department has the inherent power to correct an erroneous initial determination. We conclude it had no such power here. Administrative agencies, like the Department of Jobs and Training, have inherent or implied power to correct erroneous decisions, so long as the rights of the parties are not prejudiced. *Pfalzgraff v. Commissioner of Economic Sec.*, 350 N.W.2d 458, 460 (Minn.App.1984). Relator was prejudiced by the reversal made by the department. *See id.*

■ Reviewing this case with special intensity, *see Ginsberg*, 481 N.W.2d at 141, we conclude employer received a result no other employer could have obtained: submission of additional evidence to a second adjudicator and reversal of an adverse decision without taking an appeal from the initial determination within 15 days. The failure to appeal made the initial determination "final." *See* Minn.Stat. § 268.10, subd. 2(3). The Department of Jobs and Training was without jurisdiction to consider the matter further, and its decisions are vacated. *See Cole*, 347 N.W.2d at 73.[4]

If we were to conclude the Department of Jobs and Training had jurisdiction to consider the matter, we would agree that employer discharged relator for misconduct.

■ Misconduct is

limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards or behavior which the employer has the right to expect of his employee.

*Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973), *quoted in Markel v. City of Circle Pines*, 479 N.W.2d 382, 384 (Minn.1992). The supreme court has expanded this definition to include "conduct demonstrating a lack of concern by the employee for her job." *Feia v. St. Cloud State College*, 309 Minn. 564, 565, 244 N.W.2d 635, 636 (1976). A single incident may constitute misconduct if the employee sufficiently disregards his or her employer's expectations. *Ress*, 448 N.W.2d at 524.

---

this statutory provision. Administrative failure to promulgate rules is without constitutional significance where the statute itself is clear and specific. *See Kibler v. Colorado*, 718 P.2d 531, 536 (Colo.1986). It is notable here that the statute provides no procedural guidance.

3. Minn.Stat. § 268.10, subd. 2(4) (1990) provides that the Commissioner sua sponte may reconsider a determination of validity of a claim and make a redetermination "on finding that an error in computation or identity or the crediting of wage credits has occurred." This

statute, however, provides no basis for a redetermination as to the issue of disqualification.

4. Unemployment benefits are entitled to procedural due process protection under the Fourteenth Amendment. *Schulte v. Transportation Unlimited, Inc.*, 354 N.W.2d 830, 832 (Minn. 1984). Because we conclude the conduct of the department failed to conform with the Minnesota Jobs and Training Law, we need not address whether the conduct violated realtor's right to due process.

At the hearing, relator's manager testified the discharge was based solely upon his refusal to meet with her as ordered on October 11, 1991. Generally, where an employer makes a reasonable request that does not impose an undue burden on the employee, the employee's refusal to comply with the request constitutes misconduct. *Sandstrom v. Douglas Mach. Corp.*, 372 N.W.2d 89, 91 (Minn.App.1985).

Relator made no attempt to explain to employer that he felt he had a right to union representation at the October 11, 1991, meeting. He did not allow employer to offer the "opportunity for association representation" or advise relator "of the nature of the investigation prior to questioning" as provided in the department's collective bargaining agreement. Instead, relator continued working on his computer until 4:29 p.m. When Grussing attempted to hand him the envelope containing the investigatory suspension, relator disregarded her and left the building screaming "get away from me" repeatedly. Relator deliberately disregarded the standard of behavior employer had a right to expect, *see Tilseth*, 295 Minn. at 374–75, 204 N.W.2d at 646, and demonstrated a lack of concern for his job, *see Feia*, 309 Minn. at 565, 244 N.W.2d at 636. The evidence in the record reasonably sustains the misconduct finding of the Commissioner's representative. *See Markel*, 479 N.W.2d at 383–84.

### DECISION

Minnesota Department of Jobs and Training lacked jurisdiction to review the initial determination that relator was not disqualified from receiving unemployment benefits where employer failed to appeal in accordance with Minn.Stat. § 268.10, subd. 2(3).

**Reversed.**